## HINSON et al. v. BRITISH AMERICA ASSUR. CO.

### No. 285.

District Court, W. D. Louisiana, Lake Charles Division.

March 27, 1942.

S. I. Foster and J. R. Ferguson, both of Leesville, La., for plaintiffs.

Coleman & Morgan, of Shreveport, La., for defendant.

PORTERIE, District Judge.

This suit was filed in the 11th Judicial District Court, parish of Vernon, Louisiana, and was removed to the Federal court by the defendant.

The petition is by two brothers, H. Elton Hinson and C. Preer Hinson, both residents of Vernon parish, who were conducting a bakery business in the town of Leesville, parish of Vernon, state of Louisiana, under the trade name of "Hinson Brothers", and it concludes with a prayer for judgment in their favor and against the defendant, the British America Assurance Co., in the sum of $3,700, with statutory imposition of 12% as damages and with the allowance of reasonable attorney's fees to the plaintiff, and it contains, further, the allegation that the said company is liable because of a contract of insurance against loss from fire, dated November 29, 1939, entered into with Hinson Brothers, insuring the furniture, fixtures, bakery machines and equipment in the sum of $3,500 and the stock of merchandise and supplies in the sum of $200.

The answer of the defendant admits the contract in all of its details, but alleges that at the date of the fire, December 19, 1939, the contract was not in full force and effect for the following reasons, to-wit:

"Further answering, your respondent affirmatively shows that, although said policy was issued as hereinabove stated, it was not in full force and effect at the date of the fire, December 19, 1939, as is alleged by petitioner for the following reasons, to-wit:

"(a) That said policy provided by its terms that the entire policy should be void if the insurer concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss, and in this connection the defendant affirmatively shows that at the time of the issuance or shortly thereafter of the policy mentioned herein C. P. and H. E. Hinson did submit to P. G. Pye, local agent for defendant, an itemized inventory showing the total valuation of stock to be $700.-00 and the total valuation of the furniture and fixtures to be $6,746.00, which inventory was false, greatly excessive and exaggerated and that said inventory was excessive and greatly exaggerated to the knowledge of C. P. and H. E. Hinson, and that it was presented to defendant's local agent for the purpose of securing excessive insurance and for the purpose of defrauding your respondent herein, which all voided said policy and that on account of said attempted fraud the policy was void and of no force and effect at the time of said fire."

The second defense is that the policy was void and of no force and effect at the time of the fire because "the business belonging to C. P. and H. E. Hinson was destroyed on the night of December 19, 1939, through a fire of incendiary origin caused by the wilful act of plaintiff or their agents in an attempt to collect insurance money * * *."

The next defense made to the fire insurance contract is in the alternative, that should the policy be declared to be in force and effect at the time of the fire "then and in that event the said policy has been void and nullified since the fire due to the false swearing on the part of the assureds and that they have sworn falsely in the following respects to-wit: That on or about January 25, 1940, plaintiffs submitted to a sworn examination requested by your respondent herein, at which time the plaintiffs herein again swore to the correctness of the itemized inventory submitted to P. G. Pye, defendant's local agent, when plaintiffs well knew said inventory to be excessive and exaggerated, all in an attempt to defraud * * *."

The next defense is that the same inventory on the stock and fixtures at the time of the fire that was sworn to falsely at the special examination, as previously alleged, is again and for the second time sworn to as being correct when it becomes attached to the petition of plaintiffs, and

954

this act by the plaintiffs is sufficient under the terms of the fire policy to render the contract void and of no force and effect.

The further defense is made, and that in the alternative, that should the court find that the policy is in full force and effect then the defendant shows "that the iron safe warranty clause relating to stock has been violated in that the assureds kept no books or records of their stock and did not keep same in an iron safe or place safe from any fire that might occur and that on account of the violation of such warranty the policy has been voided and was voided at the time of the fire as to all items insured on stock."

The next defense is made in the alternative, that should the court find that the said policy is still in effect, then it is alleged that "said policy contains a distribution clause, under the terms of which the loss on fixtures was to be distributed with other insurance insuring the same items, whether such other insurance was valid or not, and that in this connection the plaintiffs herein at the time of the loss had a policy of insurance with the Scottish Union and National Insurance Company insuring $500.00 on furniture and fixtures and that said distribution clause should be applied to the loss."

The next and final defense made in the alternative is that should the court find that the policy sued on is still in force and effect "that the inventory on stock and fixtures made a part of plaintiff's petition is excessive and exaggerated * * *."

The co-plaintiff is the Texas Star Flour Mills, a corporation organized and existing under the laws of the state of Texas and doing business in the city of Galveston, which appears as the assignee of C. P. and H. E. Hinson to the extent of $1,-070.75 in the policy of insurance; it is the unpaid vendor of sixty barrels of flour comprising a part of the stock destroyed by the fire. The defendant alleges in its answer that the assignee acquires no special right as third party under the assignment.

The two Hinsons came to Leesville, Louisiana, early in the year 1938 from Florida and together, as partners, bought from Mr. John Mansinger the then-called City Bakery for the price of $2,400, $1,-200 being paid cash and the balance to be paid $25 per month. The lot and building also belonged to Mr. John Mansinger and they were not sold by Mr. Mansinger, and the Hinsons leased the lot and building for an indefinite period at $25 per month. Mansinger had the bakery equipment and stock already insured in the sums of $500 and $300 respectively, and this contract was transferred to the Hinson Brothers and is the policy referred to by the defendant when, in paragraph 21 of its answer, it prays for the distribution clause to be applied.

The evidence is that one of the brothers, H. E. Hinson, was the real baker, stayed at the bakery and generally managed all the business—nearly to the exclusion of his brother, who was one of the two truck drivers working for the bakery on the road, taking orders for and delivering bread over Vernon and surrounding parishes.

The unquestioned evidence is that a slight fire caused by the explosion of an oil stove had occurred at the home of C. P. Hinson and the small damage had been readily adjusted by Mr. P. G. Pye, who conducts a local insurance business at Leesville and has been the local agent for the defendant company for a number of years.

Mr. Pye, a resident of Leesville for forty years, of most excellent reputation, testified, in corroboration of the Hinsons, that late one afternoon when going home from his office and shortly after the small damage at the residence of C. P. Hinson, he stopped to talk to Mr. H. Elton Hinson who was standing at the door of the bakery. The subject of the recent loss arose and Mr. Pye said, speaking to Elton Hinson, "It could have been you just as easily." He admits having mentioned the fact that "they should have more insurance on that bakery than they had." He suggested that an itemized list of the machinery and equipment be made and given to him so that a policy might be issued. Elton Hinson immediately replied: "If you will come in here we will do it now." The same evening Mr. Pye came to the bakery and met Elton Hinson, and the inventory of furniture, fixtures and stock was made; and Mr. Pye testified: "As I called off things or he called off things, he (Hinson) said: 'You write the things down and I will put the valuation on them.'" The inventory was thus roughly made, taken by Pye to his office, typed in duplicate, and signed by Hinson. In the making of this inventory there arises the important fact that the values on the inventory were fixed by Hinson for the various items of equipment at their replacement value as new,

and Mr. Pye's exact answer on this point, to the question of the court: "Are you positive that you didn't tell Hinson to give you a list of these articles as new, their cost value new, as the basis of the estimate?" was: "I would not be positive about that, Judge, no sir. I simply supposed he would give me the correct values, because I didn't know what they were."

H. E. Hinson's testimony on this subject under cross-examination is as follows: "Q. How did you come to take this policy out on the 29th of November?" "A. The thirty-seven hundred?" "Q. Yes." "A. Good sales talk by your local agent, Mr. Pye. You see Mr. Pye wrote the insurance on the oven, and he says, 'I appreciate this business', and he says, 'later on I want you to take out some insurance on the rest of your equipment.' Well, we didn't have only that eight hundred dollars. Then we had a little incident to happen that got me to thinking about it more than I had. Over at my brother's house his oil stove exploded, in other words, went up in flames, and damaged the room quite a bit, that is the oil stove did, and he was down at the bakery and his wife called up and I says, 'Mr. Pye, as soon as I get in better shape I think I had better take another policy.' He says, 'You never can tell.' He says, 'You better take out some more insurance now on the bakery.' I says, 'Mr. Pye, we will see about it.' I let it go at that. Then he came down to the bakery and he says, 'Well, what do you think about it?' I says, 'Well, I don't know, Mr. Pye. I have been thinking about it, but I haven't made up my mind.' So we talked there for quite a bit and he told me the good features about insurance, and after a while I decided to go ahead and take out a policy with him. He says, 'All right, you give me a list or inventory of everything you have in this bakery here at whatever it would cost you to replace it or buy it new.' I says, 'I have some old equipment here—shall I also list that at its replacement value?' He says, 'If something happened to it and it was to burn up you would have to replace it', and he started to the front door and my wife was sitting there and she says, 'If you are going to carry insurance enough to pay for its replacement it is going to make your policy awful high if you value it at what it would cost new.' He says, 'Well, if you had a fire you would have to replace it.' I took out that insurance in good faith, and I put my figures on there the best I knew how in the short time that we were there taking that inventory. He took the inventory sheet and in about an hour he brought it back down there, and I was sitting at the desk doing some work, and he says, 'Here, just look over this inventory sheet and sign it.' Then I signed it and he gave me the policy."

A short time after the date of this policy (November 29, 1939), in the very early morning of December 19, 1939, H. E. Hinson, as he did every day, went to the bakery to start his work.

He says he entered from the front door, turned on the light over the front of the bakery and went on into the back to build a fire under the boiler, using paper and wood. Upon the striking of a match an explosion occurred, knocking Hinson through the galvanized iron side door and out into the open. He says that when he came to himself the interior of the building was on fire. He ran immediately from there to the fire station and gave an alarm, the fire station being only two blocks away.

The front part of the building was of brick, and, the fire being in the rear part, which was of galvanized iron, the flames were held down by the firefighters, so that the brick part was not much destroyed but the rear part of wood and galvanized iron was completely destroyed.

The defendant company, after making some inquiry, decided to hold, and did hold, an examination into the cause of the fire, at Leesville, Louisiana, on January 25, 1940. The two Hinsons were examined thoroughly. The record, comprising seventy letter-sized pages, was filed and made a part of the suit. We have read this record and find that it contains substantially, with but very little variance, what the two Hinsons testified at the trial.

On January 3, 1940, the Fire Companies Adjustment Bureau sent Mr. John S. Huey, consulting engineer with specific experience in making estimates of fire loss on machinery, etc., to Leesville, Louisiana, for the examination of the burned premises. Mr. Louis Schulz of New Orleans, Louisiana, who owns and operates a general machine shop specializing in the repairing and overhauling of bakery machinery, etc., made a personal inspection of the damaged machines at the bakery at Leesville about the first of May, 1940, and his testimony, by deposition, was placed by the plaintiffs in the record.

The court believes, from all of the oral and documentary evidence furnished, that H. E. Hinson was in good 'faith in giving his values to Mr. Pye, the agent of the company, at replacement value as new, because when we compare the valuations of Mr. Schulz, expert for plaintiffs, and of Mr. Huey, the expert for defendant, the cost of replacing the equipment sound, as in the secondhand condition that it was at the time of the fire, aggregates a sum which warrants the face of the policy.

On the point that in the filing of suit the same original inventory was sworn to with the petition, we say that there is nothing else that the pleader could have done; and that fiat by itself cannot serve as a cause to vitiate the policy.

We come now to the second defense —that the fire was of incendiary origin, caused by the wilful act of H. E. Hinson. "Proof beyond a reasonable doubt * * * is not necessary to sustain a charge of arson made in defense of a civil suit on a fire insurance policy. A preponderance of the evidence in such a case is sufficient." Picoraro v. Insurance Co. of State of Pennsylvania, 175 La. 416, 420, 143 So. 360, 361. The policy of law expressed in Barlow v. Harrison, 51 La.Ann. 875, 25 So. 378, and in Belcher v. Booth, 164 La. 514, 114 So. 116, 118, that "* * * fraud should be proven to that degree of certainty which warrants the conviction of a person who is charged with the commission of a crime, i. e., beyond a reasonable doubt." is not to apply. See, also, Wilson v. Aetna Insurance Co., La.App., 161 So. 650; Parker et al. v. Hartford Fire Ins. Co. of Hartford, Connecticut, La.App., 163 So. 435, and Catalanotto v. Minneapolis Fire & Marine Insurance Co., 15 La.App. 320, 131 So. 705.

Therefore, in the interpretation of the facts, direct and circumstantial, we shall apply the deciding rule of the preponderance of the evidence.

Hinson says that he was expelled by the force of the explosion through the galvanized double doors located on the south side of the bakery—and in the rear of the building, that part built of corrugated iron. The defendant presses many circumstantial facts as against the possibility of this having occurred. It shows that Hinson was able to get up and run, without physical trouble, to the fire house about two blocks away. It claims that there were no bruises or contusions on the body of Hinson, and neither then nor since has he required any medical treatment for injuries.

Defendant urges the cumulation of many other circumstances which tend to disprove the truthfulness of Hinson's claim that he was propelled through this double door. It claims that when Hinson entered his bakery in the early morning from the front door and walked through to the very back end of the building, to that part which had a dirt floor and where the boiler was located, to light the fire, he should have detected the smell of Cal-Odor that would have evaporated from a leak in the butane gas connection. It contends that if there was a butane gas leak and there was an explosion, such an explosion, according to its expert witness, would not ignite anything. There would be an explosion but no flame would result. The expert further shows that black smoke is neither the resultant nor the concomitant of a butane gas explosion nor causes the ignition of wood or of any other nearby combustible material.

Moreover, the point is made that the galvanized iron double door remained on its hinges and the two doors at the middle were still held together by a lock and chain. The solid construction of the double doors is urged as a proof against the possible expulsion through either one of the folders of the door, by showing that the outer frame of each folder is of 2x6 timber, with one 2x4 diagonal in each folder.

Then, in addition to these cumulated physical facts pointing against the truthfulness of Hinson's story of the fire and the manner of his being pitched out of the building by the explosive force, there are the following circumstantial facts pointing to the exceptional interest that Hinson had in the burning of his own bakery.

(a) It is shown from a comparison of the annual receipts and disbursements of the business that the bakery business was coming out about even—the only profit is that the salaries of the two brothers are included in the cost of operation and consequently it may be said that they were each earning a livelihood from the operation of the bakery.

(b) It was proved that though the sales in 1938, from the books of the bakery, of $21,115.73, compared to the purchases for the same year of $10,812.36, represented a margin of practically 40% of profit, this profit was totally used in meeting the salaries of those working for the bakery.

(c) It is presented that the partnership was beset with harassing debts, among which was the rent of $25 per month, the balance due of $25 per month on the original sale price of the Mansinger bakery equipment, and a number of other monthly instalments and dues, as follows: dough mixer, $29.60 per month; truck, $43.20 per month; Kennedy oven, $50 per month; personal automobile, $31 per month; large sealing oven, $13.82 per month; butane equipment, $11 per month; Cooper Furniture Co., $18.60 per month; electricity, $20 per month; salary of five employees, including the two brothers, $375 per month; a total of $642.22.

(d) The other vexatious obligations, accounts payable, are as follows: Dixie Wax Paper Co., $258; Sani Wax Paper Co. (check of $50 outstanding and turned down by bank), $91; Kelly-Webber Co., equipment, $169.63; gas (butane), $55; Charles Dennery & Co. (fruit cake supplies) (with check of $123.06 out, turned down at the bank), $226.44; Texas Star Flour Mills, $1,070.75; a total of $1,870.82.

(e) It is urged in particular as an item of debt that the main note of $1,168.75, and the monthly instalments of $50 representing the credit part of the purchase price of the large oven (not insured under this policy), were past due since May 16, 1939.

(f) Finally, the monthly instalments ($29.60) since the date of purchase (Feb. 23, 1939) of the Triumph High Speed Dough Mixer, the next heaviest item of debt, were unpaid.

(g) Next is one of the links the most stressed in the very long chain of circumstantial evidence presented by the defendant. The Hinsons, upon their purchase of the bakery equipment from Mr. Mansinger, in March, 1938, continued the nominal insurance of $800 ($500 plus $300) that Mansinger had at that time and it was not very long (November 29, 1939) before the plaintiffs increased the insurance substantially by the policy in this case, adding the amount of $3,700, with the fire occurring within less than a month, on December 19, 1939.

(h) The defendant company, through the testimony of one A. L. Kimmey, a resident of Leesville for seven years, who operated a small business just north of the bakery building and who, on the night of the fire, was asleep in the rear of his building, brings to the court's attention the fact that Kimmey was awakened by a thud or explosion and within a few seconds he opened the back door of his sleeping apartment, saw black smoke and a blaze of fire coming out of the window of the bakery on the north side just fifteen feet away from him. Kimmey's Cafe and the bakery had a common wall but the cafe building did not extend as deeply as the bakery building; in fact, was a little shorter than the brick wall of the bakery, thus leaving the rear tin addition to the bakery immediately to the view of Kimmey as he opened the back door of his building. The double doors were on the opposite side of the bakery building in the rear, the tin part, and, consequently, could not then be seen by Kimmey. He observed the black smoke accompanied by flame coming out of the window in the tin part of the bakery on his side.

Then, the defendant, through its expert chemist, brought out the claim that since butane gas in explosion under the circumstances would not cause heavy black smoke and not immediately give a flame, whatever fire and smoke existed in the back part of the bakery so quickly after the explosion could not have been the result of the explosion of butane gas.

In sum, the defendant company submits that here is a business which is unable to meet its obligations; "N.S.F." checks are outstanding in the hands of creditors; instalments due on the numerous unpaid purchases are in arrears; a nominal amount of fire insurance is suddenly substantially increased, and twenty days thereafter the subject of the protective insurance burns. With these circumstantial facts, there is a version of the fire given by the plaintiffs which is not reasonable; a human being was thrown through a galvanized door without requiring subsequent medical treatment. Further, the defendant company shows that no claim is made that the butane gas system had not been working properly before, and shows finally that no one else but the Hinsons chanced to profit from the fire, as Mr. John Mansinger, the owner of the brick building worth $4,000, carried only $1,000 of fire protection.

The court must now give consideration to the facts, direct and circumstantial, that point to the opposite conclusion.

(a) It was testified by all the witnesses from the town of Leesville, Louisiana, whether called by the plaintiffs or the defendant, that the two Hinsons were of excellent character, sober and industrious.

The Hinsons had never had a fire loss except for the small damage caused by the oil stove explosion at the residence of C. P. Hinson (which apparently, from the story of this case, led to the substantially greater insurance on the bakery equipment and supplies).

(b) There is nothing abnormal in the Hinsons having sought substantially more insurance than they had before because, since their purchase of the bakery from Mansinger, they had bought and placed in the bakery, at proportionately additional cost, numerous items of equipment—for the most part new. One item alone, the Kennedy oven, covered by special policy of fire insurance not involved in this case, had cost $2,400, practically the price for which Mansinger had sold the whole bakery equipment and supplies to the Hinson brothers almost two years before. This Kennedy oven was separately insured by the Buffalo Insurance Co. for $1,600, and this insurance has been paid in full. The Triumph Dough Mixer, added as new equipment, had cost $895, not to mention another machine costing $600, a slicer machine costing $300, and several other items costing $150 and more. There was reason for additional insurance, because there was two or three times more in value to protect against loss from fire.

(c) We believe that C. P. Hinson in good faith made his estimate of the value of the equipment at the time of application for the policy as if to be replaced new instead of making it, as he should have, the actual value. This good faith is shown because $3,500 is all the coverage he asked for on the equipment, when his valuation as given reached the sum of $7,111.

(d) On the stock and supplies which he valued at the time at $700 he took only the amount of $200 in insurance; yet on the large main Kennedy baking oven which had cost $2,400, he had seen the seller-manufacturer take a policy of $1,600 to protect itself.

(e) Just five days before Christmas, on December 19, we find the equipment in good running order, the stock plentiful, orders unfilled, with $375 worth of fruit cakes actually baked, and with a quantity of fruit cake dough prepared and ready to be baked. During the holiday season the bakery business is the best in the year. There was no suit filed against Hinson, and though he was in arrears with his creditors, the Christmas cash receipts immediately in sight would have placed all his instalment creditors on a cash footing with the exception of the main note due on the expensive dough mixer.

(f) Even as to this latter debt, it is shown by the record that if the small monthly instalments in arrears were to be paid, the article being in very good condition, the seller was willing and ready to extend the main obligation.

(g) The court must believe that if either one or both of the Hinsons had been with fraudulent intent, it would have been a far more profitable fraudulent policy to have enjoyed the good Christmas business, pocketed part of the cash, paid partly the debts, and then filed proceedings in bankruptcy.

(h) It is reasonable to assume that it would have been evident to the Hinsons that whatever money would be paid them through the fire insurance contract would have to go to their creditors. This is shown by the action of the Texas Flour Mills, assignee and co-plaintiff, which alone takes care of $1,070.35 (nearly one-third of the face of the policy), and by the suit of one other creditor since the fire.

(i) The attempt is made by the defendant to show that there was such live competition in the bread business at Leesville from outside bakeries, particularly one located at Lake Charles, that the Hinsons were about to be stifled in their business. The degree of competition is shown by testimony that one competitor had an agent call at a few homes, and because a loaf of bread of its make was found in the home a one-dollar bill was given to the housewife. It was developed, however, by cross-examination of the witnesses of the defendant company that the merchants of Leesville, moved by the desire to protect local industry, had actually had a meeting and had voted unanimously to give, and did give, their bread business to the local bakery of the Hinson brothers.

(j) The evidence is that the monthly average gross sales amounted to $2,000. It is shown that 40% is a normal profit on gross sales in the country bakery business. So the Hinsons had $800 per month, ample to cover the $642.22, previously shown as necessary to cover monthly salaries and monthly instalments, and to leave a balance to apply on capital outlay.

(k) It is true that the Hinson brothers, through the instalment method, had contracted great debt as compared to their

actual worth; but in each instance of a substantial purchase there had been a substantial amount paid; and the condition of the business was that its capital outlay was being enhanced and at the same time the two young men were earning a livelihood. The purpose of fire protection contracts is to enable one, in case of fire loss, to pay the debts of the business; and it is quite logically arguable that the very fact of increased indebtedness, with the consequent increase of physical assets, brought about the necessity of increased insurance.

(1) As to a few small checks being out and having been returned "not sufficient funds", the representative of the local bank said that was quite a common occurrence and was indicative of either one of two things: carelessness, or running into close financial straits. Both reasons, we believe, exist in this case.

(m) The manner in which the Hinsons acted after the fire, the kind of people who surrounded them and came to their assistance after the fire, and the apparent willingness with which the witnesses testified to the Hinsons' good reputation, indicate to the court the total absence in the community of any suspicion being placed on the Hinsons of having set this fire—a fire which, to some degree, endangered a number of other buildings near the bakery in the heart of the little town of Leesville.

(n) We have thought of the violent, skunky odor that is supposed to have come from the butane gas in the event of a leak in the system, and granting that there was present this patented liquid called Cal-Odor mixed with the escaping butane gas (this is proved in the case only by hearsay —the agent of the local company said that it was supposed to be present—nothing more direct), there are two points which offset the natural presumption that the Cal-Odor should have been detected by Hinson as soon as he entered the building on that early morning. These are (1) that he was taken with a bad cold and could not detect the odor if there were any, and (2) that there is the ordinarily peculiar odor of the leaven and other substances in a bakery shop, especially when closed.

(o) Plaintiffs, in rebuttal, through a witness who for two years has been in the butane gas business as manager of the Atchison Gas Co. and whose company after the fire bought the butane tank, showed that (1) an excess flowvalve, such as was at-tached to the Hinson brothers' gas connection, would "check flow of gas in a broken line but it is not a positive stop" and (2) that black smoke comes from a butane gas flame, and notably came from the very butane gas flame burning after the fire, from a pipe by the side of the brick wall and under the corrugated iron shed.

(p) Let us take now the specific question as to whether or not Hinson went through the galvanized iron double door.

One of the most important witnesses is Mr. Luther Dowden, who was the fire chief of Leesville at the time of the fire. He says the cries uttered by Hinson as Hinson ran the short distance from the bakery to the fire house (about two blocks) awoke him. He says he rose, dressed and got down by the time Hinson reached the fire house; and that within a few minutes' time he had water on the building. Speaking of the fire hose, he said "I had to get one of them around to the rear end of the building where we could get in. The front end was so full of smoke you couldn't do anything there." The evidence from several witnesses is to the effect that the wind was blowing from the back of the building towards the front. The fire was mainly in the rear of the building, and the smoke and leaping flames went towards the front, the brick end. "I carried a line of hose myself in the rear end there on the side where they had a double door." (pointing to the doors through which Hinson came.) We should quote further what the fire chief said: "The Court: (interrupting) 'Let the record show that he points to the same two doors that plaintiff pointed out.' Q. (by Mr. Foster:) 'Go ahead—what was the condition of these doors?' A. 'I found the east door from the bakery here practically all the way open. This door here didn't seem to swing but about three or four feet, swung around that way. These were doors something like eight by ten—maybe not quite that wide, but about ten feet tall, maybe twelve feet, opening there, and this door over here on the left facing that part of the door from the east swung out about I would say a foot or two, that is from the framework here, and it was braced across this way, you see. This door was swung about like that, and from my observation it was still fastened on to this other door with a lock and chain.' The Court: 'It was loose from its fastening on the building itself?' The Witness: 'Yes, sir, the hinges weren't pulled loose.

It was from the front side where the tin —it looked like where that two by six went through it was loose.' The Court: 'Was the tin loose on the right-hand side?' The Witness: 'Only that where the two by six .was nailed. The doors was getting in bad shape.' The Court: 'From the heat?' The Witness: 'No sir, they was old doors."

The record is then that Mr. Dowden, who entered the building with the hose at the very beginning of the fire, says that he actually entered through the double door in question, through the portion where the tin was loose.

This physical fact plus the other physical facts proved by Kimmey, the defense witness, that the thud of an explosion awakened him, influenced the court strongly and quite preponderantly, too, in the belief that Hinson did not set fire to the bakery.

There is nothing unusual in the circumstance that he was there at that hour to light a fire, and that his boiler was heated from butane gas. Moreover, we do not believe that the force of the explosion only drove him through the old doors, whose tin was not securely nailed, but that, with instinctive reflex action, he threw himself also against the door, the tin gave way, and he went through.

The question was asked of the fire chief: "Did you see anything out of the ordinary about the origin of that fire that morning?" His reply was: "No, sir, nothing that I could find after I got into where we could get the fire quieted down to where we could get inside. I found nothing except a butane gas line that was burning. I couldn't see anything for another reason that it was so hot and hard to control that I was busy attempting to control it, and I had to get it cut down to where I could get inside the building." And again, to another question: "Well, I couldn't say what caused the fire. All I know is after we got it cut down to where we could get in there the only thing that I could see was the butane line was burning. That tank was under the house at the back and the line came up through the building, and that was on fire."

And again, on the same subject, he says: "It was burning through a leak in the line. That line came from the tank and joined —it came along the board partition underneath next to the brick wall. I would say ten feet from the brick wall they had a little built-up room in there, and it was leaking in there somewhere where it went through these pipes and was coming through the tin building. That was a dirt floor back there then. The pipe comes in through the wooden floor into the brick part."

We should condense the evidence as to the doors, their construction and their condition at the time of the fire. The door opening was eight feet and the height of the doors, ten feet. There were two folding doors hinged right and left, joined in the center with lock and chain. The outer frame of each folder was of wood, 2x6, dressed, with but one diagonal of wood, 2x4, dressed. The folders were covered with the ordinary thin commercial thickness of corrugated galvanized iron. After the fire, the lock and chain were still on the doors; there was but the opening of an inch between the doors; they had been built several years previously and had sagged some. They were up and were not unhinged. Facing the doors from the outside, the lower left-hand corner of the right door was in bad condition. The iron was loose at this left lower corner and, more important, the vertical 2x6 at that corner was loose at the joint, pulled off with nails exposed, and was partly torn away from the right-hand door but held by the lock and chain at its middle.

(q) The evidence of Mr. Alfred Stevens, a local Leesville barber, is that the next day after the fire he had occasion to cut the hair of H. E. Hinson, and that "his hair was singed."

■ All in .all, therefore, we must say that the evidence preponderates against the conclusion that the fire was of incendiary origin caused by the wilful act of the Hinsons.

■ We now come to the alternative defense in that the policy has been voided and was void at the time of the fire as to all items of stock because the Hinsons kept no books or records of their stock and did not keep the books in an iron safe or in a safe place from fire that might occur.

The first differentiation we make in the instant case as compared to the two cases cited to us in defendant's brief, Knowles v. Dixie Fire Ins. Co., 177 La. 941, 149 So. 528, and Gershon v. National Ins. Co., 177 La. 148, 148 So. 10, is that in the instant case the stock of a bakery is merely

the flour, the lard, the sugar, and the flavoring extract that are used in the preparation of bread and cakes, while in the two cases cited reference is altogether made to "stock in trade" in general merchandise stores.

There was an inventory furnished by Hinson brothers to Mr. Pye, representing the defendant, at the very time of the taking of this policy, dated November 29, 1939, which shows "stock of flour, sugar, lard, flavoring extracts—$700.00". In addition, on the same page are listed 38 separate items of equipment, each given a value, totaling $7,111, and in addition to that is shown "1 large main baking oven, $2,400.00", the latter not being covered by the insurance policy at issue. The grand total is $10,211.

Though this inventory of the stock might appear scant, showing but four subdivisions without separate valuations, these are practically the only items comprising the stock of a bakery. Mr. Pye, the agent of the company, was present on the premises and viewed in person every item of equipment and the stock on hand, and we must conclude that this satisfies the requisite of the policy contract.

We now come to the next item (no. 7) of the Conditions and Provisions of the insurance contract under the Iron Safe Clause: that the insured "kept no books or records of their stock and did not keep same in an iron safe or place safe from any fire that might occur."

The bookkeeper for the Hinsons was Mr. George Ferguson, a resident of Leesville and the bookkeeper for 34 years of the Nona Mills Co., Inc., who, without stated salary, kept the books for the Hinson brothers. The books were brought to court and subjected to examination, and cross-examination was made from them. The books furnished ready and clear information such as this: that the total business transacted from Jan. 1, 1939, to December 19, 1939 (the date of fire), was $21,145.49; that the 1938 sales were $28,115.73; that the purchases for the year 1938 were $10,812.36, and for 1939, $10,942.30.

Mr. Ferguson kept a daily record, but he did not post the books every day. To the question: "Did you keep an account of the cash they were spending each day?" the answer is "Yes, sir. That is from the sales sheet, from the extension sheets."

He stated that he kept a combination ledger and cash book.

It was apparent and demonstrated to the satisfaction of the court that every item of receipt and of disbursement could readily be given by the day, the month and the year. The items, cash slips and invoices, were made and entered daily at the bakery but were taken just from time to time by Mr. Ferguson to his office and posted on the books.

The books were kept in the iron vaults of the lumber company. The lumber company's building was not in danger from fire if the bakery burned. Moore et al. v. Louisiana Fire Ins. Co., 177 La. 645, 148 So. 904.

Mr. Ferguson admits that he did not keep a separate cash book nor did he keep a journal, but claimed that the books he brought to court represented a combination journal and ledger. The Hinsons at the bakery faithfully kept a check book and from this check book Ferguson made the entries.

On cross examination of Mr. Ferguson with his books before him he answered readily every question asked, and pointed to the books in corroboration and substantiation, giving income and outgo for any month of any year that the Hinsons were in business. Incidentally, this showed that the business was just about carrying the operating costs, including the two salaries of the Hinsons. A special examination was made of the books and of Mr. Ferguson and it proved that all instalment payments were duly and regularly entered. In other words, they were earning a livelihood from their business. Mr. Ferguson assisted in making the inventory of loss after the fire for the Hinsons.

Mr. Ferguson, in answer to the question: "You would not say that was a complete report of their business or a complete set of books?" replied: "Not according to auditing standards it is not; I did not keep a separate cash book or a separate journal. This is the book that I did keep."

The books that were brought to court showed the business of the Hinsons from the time they began operating their bakery at Leesville until the time of the fire; it was admitted by Mr. Ferguson, however, that he had not posted the books since September before the fire but that, as usual, from the items kept by the Hinsons of in-

come and outgo, he had afterwards posted the books to date of fire. This was just as he had been in the habit of doing from time to time previously. Mr. Ferguson said that after the fire, on December 28, 1939, he, Mr. Mansinger and H. E. Hinson, the three together, made the inventory of the itemized stock loss in the aggregate of $1,406.27, comprising 60 items, with each item valued, which inventory was exhibited at the examination held on January 25, 1940, filed with the company, and again filed at the trial of this suit.

Considering the conditions of the contract and the law applicable, we cannot say that the policy on the stock was vitiated on this score.

There are several other acts of Hinson that directly point to his honesty in this insurance matter or else would make him astute quite beyond belief. Firstly, $3,500 was not a high amount of insurance when compared to the value of his equipment. Secondly, he would have taken the care to have begun the keeping of a complete set of books, and not have continued but the partial set of books through Mr. Ferguson, though, as explained before, sufficiently honest and informative as to not vitiate the policy; at least, he would have posted the books to date. He would not have given the value of the equipment as of replacement new, as he could have given its actual, sound value at the time and have secured the same allowance of protection of $3,500. Again, and finally, he paid but $45 on his premium, leaving a part ($44.06) of the premium unpaid at the time of fire. It seems to us that if he had intended to burn the building he would have had the premium fully paid.

■ We have read with care and attention the law quoted on this phase of the case by the defendant. It is stated in American Jurisprudence, Vol. 29, § 1132, that "* * * In some of the cases it has been said that an overvaluation made by the insured through error of judgment or inadvertence is, in effect, merely an expression of opinion which affords no ground for an avoidance of the policy, and will not cause a forfeiture thereof."

The facts in the three cases cited by the defendant company, to-wit: Alfred Hiller Co. v. Insurance Company of North America, 125 La. 938, 52 So. 104, 32 L.R.A.,N.S., 453; Orenstein et al. v. Star Ins. Company of America, 4 Cir., 10 F.2d 754; Garnier v. Aetna Ins. Company, 181 La.

426, 159 So. 705, are not nearly the facts of this case, either in subject-matter, in amounts involved, or, most importantly, in moral background. We do accept their legal principles, however.

■ The applicable paragraph of the policy which is the subject of this suit is the usual one, reading as follows: "This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated therein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss." In the case of Garnier v. Aetna Ins. Co., supra, the court says (159 So. at page 707): "The law in such cases is elaborately discussed in the case of Columbian Ins. Co. v. Modern Laundry [8 Cir.], 277 F. 355, 20 A.L.R. 1159. In a note following that case, as published in 20 A.L.R., the rule is stated thus: 'Where an insured knowingly and wilfully overestimates in his proof of loss the value of the property destroyed, with the intention of deceiving the insurer, such overvaluation will avoid the policy and defeat any right of the insured to recover thereon.'" We are unable, upon the preponderance of the evidence, to say that the insured knowingly and wilfully overestimated, in his application for insurance or in his proof of loss, the value of the property destroyed, with the intention of deceiving the insurers.

We find the facts in the Louisiana case of Alfred Hiller Co. v. Insurance Co. of North America, supra, to be altogether different from the facts of the instant case. In the cited case there was an actual heavy padding of the quantity of the cement claimed to have been destroyed by fire. The item actually imported into the claim was 1,600 barrels of cement. In the instant case there has not been the padding of a single item, large or small, by the insured; there has merely been the giving of replacement cost values as new of the items of the bakery equipment, openly and directly to the agent as the two moved about the bakery from item to item, and in good faith. There is nothing in the language of the application referring to the value of the articles insured which would put a layman on guard as to exact-

ly what value he is furnishing, especially if the conversation with the agent has led the insured to give cost values at time of purchase of equipment new.

The next thing for the court to do is to arrive at the actual loss sustained by the Hinsons. Reproduction cost is not the amount to be allowed; we must arrive at the sound value of the equipment on the date of the fire; so, if one item of equipment is damaged beyond repair, or if to repair the item would exceed the value of the article, the total sound value of that item at the date of fire is the loss to be awarded on that item; if repairing the article is advisable, then the cost of repairing the article plus any difference in value between the then repaired article and its sound value on the date of fire, if any, is to be awarded.

There are many difficulties met in following the above rule. If the fire had razed the premises we should merely have to reach the sound value of each article and declare that to be the loss; but the fire was very destructive in the rear part of the building (the tin part) but did not invade the front part (the brick part) so much. In the front part, however, there has been some scorching by the flames of the wooden articles and some considerable damage done by the intense heat and the heavy smoke; and then, as to some articles made of wood, like the dough troughs, the damage by water was greater than by flame or smoke. In addition to these troubles, some of the articles were practically new because the Hinsons themselves had bought them since their location at Leesville; but some of the articles, which they bought secondhand from Mansinger, are as old as fifteen years, with varying degrees of use. Then, again, some of the articles bought by the Hinsons since their coming to Leesville were bought secondhand but in excellent condition and at relatively low prices. The defendant, on these latter purchases, wishes to hold the recovery of the plaintiffs to the actual prices paid; we believe the sound value to be the fair gauge of worth.

We should outline the evidence from which we must reach a decision on this point.

For the plaintiffs, we have the evidence of Mr. Louis Schulz, of New Orleans, with an experience of thirty years as a bakery machinist, who conducts his own shop and repairs and overhauls any and all kinds of bakery machinery. He came to Leesville, and looked over the damage from this fire to the bakery equipment. His sworn report is that the following articles are a total loss: one Reed Slow Mixer, one Reco cake machine, one steam boiler, one Miller Sealing machine, all pans, three bread racks, one Micro slicer, one wooden dough trough, one pan rack, one work table, one roll rack, one exhaust fan. He also says that the following articles are subject to repair, as follows: one Champion dough brake, $400; one Reed cake machine, 36 qt., $300; one high speed Triumph mixer, $500; one Dutchess bun divider, $50; total repairs, $1,250.

We have the original declaration of value ($7,111) made by the Hinsons at the time of the application, based on replacement value new of the equipment. This declaration by the Hinsons is substantially supported as to the replacement value of each item by the firm of Charles Dennery of New Orleans, Louisiana, dealers in general baking equipment, established since 1894.

For the defendant, we have the evidence of Mr. John S. Huey, a graduate mechanical and electrical engineer of thirty-six years' experience, who has been for the last sixteen years a consulting engineer with the specialty in that general field of making estimates of fire losses on machinery for insurance companies, etc. The manner of arriving at his estimate was in this way: before leaving New Orleans to go to Leesville for the purpose of examining the burned equipment on the premises, he applied to and received from the Charles Dennery company the verification of the replacement-as-new values of the Hinson equipment. This estimate furnished him was substantially the duplicate of the values as new of the equipment made by the Hinsons at the time of their application.

The itemized report made by Mr. Huey gives three things: the reproduction cost (as new), the sound value (date of fire), and the loss (by fire) of each article. His report excludes the attic fan, the sink, a proofing room, and the butane storage tank. His report is that the total reproduction cost would be $6,026.50; the total sound value of the equipment at time of fire was $3,932.40; and the total actual loss from the fire from any and all types of damage is $2,760.

To illustrate the difficulty of arriving at a definite conclusion on each item, we

might illustrate with the motor-driven dough mixer. The Hinsons placed it at $800; Dennery says a new one would cost $800; Huey says a new one would cost $540, and that its sound value was $324, and since it was totally destroyed, he places $324 in the loss column. Schulz reports this article as a total loss, but since he has not estimated the reproduction-as-sound cost but merely the cost of repair, we do not have a value as sound from Schulz on this article. Hr. Huey claims that $324 allowed on this item is far too much and was a mistake by him, since he did not know that this machine was twelve years old at the time of fire and was really not in use. This dough mixer had been placed in the rear of the building by the Hinsons at the time that they supplanted it with one of new, modern type, paying for the new mixer $895 and the company allowing "$95.00 deduction (allowance) for old mixer", leaving the mixer on the premises. Mr. Huey says 10% of $600 is the sound value, or $60.

This is the only item of high value in all of the equipment where great disparity exists as to worth. Granting that Hinson, in making his application, was in good faith in giving replacement values, as if new, one readily sees that his appraisal of this item at $800.00 was correct since it had cost at time of purchase $800. Once his good faith is granted, as we have concluded elsewhere in this opinion, he is freed of any intent to defraud when he placed this item at replacement value.

Another instance of wide disagreement, though over an item of small value, is shown in the estimates of the value of the large work table. Mr. Huey gives its reproduction new as $65, its sound value at time of fire as $50, and allows a loss of $25. Mr. Schulz declares this item a total loss. The evidence is that, though this large work table did not burn and is but slightly scorched, the effect of the water and smoke on it has made it totally valueless to the bakery as it would, when used, give bad taste to the dough.

On numerous other items of equipment such a variance does not arise.

Slight disparities occur between the Hinson statement for new and the Dennery price list for new, as follows: a sealer at $150, compared to $115; a sealing machine at $300, compared to $230; a cake machine at $600, compared to $525.

There is another item of variance, and that is as to the "underground tank and piping", where one exhibit shows a damage of $365 and the defendant company shows a damage of only $10, on the contention that no depreciation nor any particular cost for repair is shown as to the tank and piping in the first exhibit. A witness for the plaintiff on this point, company manager of the Atchison Gas Company, shows that the excavation made to get the tank out for repairs cost $15 and that $50 went for the labor cost of the repair, and that new fittings (to replace) cost $15, making a total for getting the tank and fittings back into the ground of $80; but that the tank was still a second-hand tank and to some degree damaged.

Conscientiously, and necessarily, we have come to the conclusion that we must arrive at some compromise of the varying aggregate amounts—as it is practically beyond human ability to do otherwise, and the detailed evidence cannot sufficiently be present to permit the taking of each item of equipment, thirty-three in number (one of which is a "lot of pans", estimated to be worth $1,000) and reach separate itemized values. The plaintiff however has proved his loss. Williams v. Fire Ass'n of Philadelphia, La.App., 193 So. 202; Brough et al. v. Presidential Fire & Marine Ins. Co., La.App., 176 So. 895, 905.

We believe that the rule of the preponderance of the evidence is followed and that impartial justice between the parties is achieved by the means and method now to be given of arriving at the total loss, when we accept as the first item of loss assessable against the defendant company the repair cost of Mr. Schulz on four items in the sum of $1,250. He is a practical expert on the particular point at hand and Mr. Huey is not.

We then go to the Huey report and check off these four items from the list: one Champion dough brake, one Reed cake machine, one high speed Triumph mixer, one Dutchess bun divider.

For the same reasons as above, we then accept the items declared by Schulz as a total loss, and then arises the question of how much we should allow plaintiffs on these items. We have decided that we shall give a price on each one of these items of total loss which will be exactly between what the sound values and the reproduction values as new are under the

Huey report. We do this because we believe the Huey estimate under sound value at the time of fire to be too low. Taking the item of the cash register, for instance, just because Hinson happens to be a good bargainer and buys a register at chance sale worth three or four hundred dollars for $175, he places the reproduction cost new at $175.

In the instance of the pans, Hinson valued them at $1,000; $500 already there when he purchased the bakery from Mansinger and $500 added since. Schulz says they were all destroyed. Huey estimates them at $1,000 on basis of reproduction cost, at $600 on basis of sound value, and, finally, puts the item at $600 under the heading of loss. We believe the taking down of $400—40% of the original cost—is too high.

Of these articles declared to be a total loss (1 Reed slow mixer, 1 Reco cake machine, 1 steam boiler, 1 Miller sealing machine, all pans, 3 bread racks, 1 Micro slicer, 1 wooden dough trough, 1 pan rack, 1 work table, 1 roll rack), the sound value under the Huey report reached the sum of $1,506, and the reproduction cost reached the sum of $2,405. The average of the two is $1,955.50.

But we must go back to the Huey report and take the actual loss declared on the items lost at the fire, which are not included in the Schulz list at all, whether it be under the items repaired or under the items of total loss, and we find these to be eighteen in number, to-wit: 3 show or display cases, $73.50; 1 National cash register, $100; 1 lot shelving, $17.50; 1 ceiling fan, $25; 1 desk, $15; 1 Burrough's adding machine, $75; 1 iron safe, $5; 1 filing cabinet, $10; two-burner oil stove, $15; large refrigerator, $100; 1 bench scale, $7.50; 1 work bench, $17.50; 1 wrapping table, $6; 2 cabinets, $15; 2 mixing bowls, $2; 1 doughnut outfit, $40; 1 small refrigerator, $75; 1 pipe and fittings for butane, $15; a total of $614.

We have two missing items to evaluate: (a) the exhaust or attic fan and (b) the actual damage to the butane tank and its connections, the pipes and fittings. The attic fan is not included in the list of Mr. Huey and, consequently, we have no estimate from him. Hinson declared the value to be $175. Mr. Schulz says the fan was totally destroyed. We assess the fan and the cost of its installation at $175. Elsewhere in the opinion it is shown that the

total injury to the tank and its connections was at least $80. We have included already the $15, placed for loss by Mr. Huey on "Pipe and Fittings for Butane"; therefore, the remainder of $65 is the loss. The total of these two items, (a) and (b), is $240.00.

Summarizing, we must assess the total loss from the fire as follows:

The repair cost on four items previously described............ $1,250.00
The estimated compromised loss, as previously explained, of the items declared to be a total loss by Schulz ................... 1,955.50
The admitted actual loss by the defendant on the remaining items ...................... 614.00
Items (a) and (b)............. 240.00

A total of................ $4,059.50

■ As to the item in the policy of $200 to cover loss of stock and supplies, the declaration by the applicant on the value of the stock and supplies on hand placed the amount at $700. The fully itemized inventory made of the loss on this item by the insured, dated December 28, 1939, shows the loss to be $1,406.27. The defendant company has not questioned these amounts. This item of $200 is, accordingly, due by the defendant company. This is true even if the $300 on the stock, found in the concurrent policy of the Scottish Union and National Insurance Company, be made contributive, as the sum of the two items is $500, greatly less than the uncontradicted loss of $1,406.27.

■ We believe, from the facts of this case and the law applicable, 12% damages on the total amount of the loss, that is, 12% on $3,700, to be due. Louisiana Act No. 168 of 1908. Under the same statute, "all reasonable attorney's fees for the prosecution and collection of such loss" are allowed. Williams v. Fire Ass'n of Philadelphia, La.App., 193 So. 202; Brough v. Presidential Fire & Marine Ins. Co., La. App., 176 So. 895.

■ A reputable, experienced, and disinterested member of the Lake Charles Bar said that the fees of the plaintiffs' lawyers herein should be between $500 and $600. We believe the amount of $500 to be fair and due.

The contribution or apportionment clause of the policy does not prevent the

judgment being in the full face of the policy on the equipment, that is, $3,500. The total loss to the insured is over $4,000 and the sum of the policy of this defendant, $3,500, and the policy of the Scottish Union and National, $500, is $4,000.

Therefore, judgment will be signed herein in favor of the plaintiffs and against the defendant in the amount of $3,700, plus 12% thereon, with legal interest from judicial demand, until paid, plus $500 for attorney's fees, and for costs.