318 So.2d 111 (1975)
Dewey MERCER, d/b/a Mercer Home Care Service, Plaintiff-Appellant,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant-Appellee.
No. 12654.
Court of Appeal of Louisiana, Second Circuit.
September 3, 1975.
*112 Cook, Clark, Egan, Yancey & King, by Edwin L. Blewer, Jr., Shreveport, for plaintiff-appellant.
Mayer, Smith & Roberts, by Paul R. Mayer, Shreveport, for defendant-appellee.
Before BOLIN, HALL and DENNIS, JJ.
BOLIN, Judge.
Plaintiff, Dewey Mercer, sued St. Paul Fire and Marine Insurance Company, seeking to recover the face amount of a $50,000 fire insurance policy. The insurance company calculated its liability under the policy to be $7,052.47, inclusive of interest and court costs, and deposited this amount into the registry of court. Without assigning written reasons the district judge rendered judgment in favor of plaintiff in the amount tendered by the insurance company. Plaintiff appeals seeking an increase in the amount of the judgment. We modify the lower court's judgment by increasing the award to $18,775.68.
The insurance policy in question insured the contents of a warehouse against loss by fire. The contents of the warehouse consisted of two different lots of merchandise purchased by Mercer as salvage following two different fires. One lot comprised of aluminum siding and related materials was purchased by Mercer after a warehouse fire in Houston, Texas. The second lot consisted of office furniture and equipment purchased after a fire at a M. L. Bath Company warehouse located in Shreveport. Mercer placed both lots of goods in a warehouse which he had rented in Shreveport. This warehouse and its contents were totally destroyed by fire of unknown origin on January 1, 1969.
This case involves two problems. One relates to the determination of the amount of merchandise in the Mercer warehouse when it was destroyed by fire. The second problem is deciding the "actual cash value" of the goods destroyed, which includes the thorny question of the actual cash value of goods purchased as salvage after a fire.
Mercer is the owner of a small home-improvement business engaged in putting aluminum siding on houses. Plaintiff's practice prior to July of 1967 was to buy siding only as needed for a particular job rather than to keep a running inventory of siding. In July of 1967, plaintiff was in Houston purchasing material for a job in Nederland, Texas, and while there he learned of a fire which had burned an aluminum siding manufacturer's outlet warehouse. After inspecting the fire-damaged goods, Mercer *113 decided to purchase a large amount of usable siding. Being unable to raise the cash for the purchase, he contacted Kelly Womack, owner of an aluminum siding supply store in Shreveport, to determine if Womack would provide the financing. Womack agreed and the two men entered into a joint venture to purchase the siding. Womack was to furnish the money for the venture and Mercer was to be the working partner.
The two men purchased the entire contents of the Houston warehouse for $2600. Mercer salvaged 1204 squares of usable aluminum siding and a large amount of related materials, such as gutters, nails, touch-up paint, etc., all of which he sent to Shreveport. He sold the rest of the material as scrap to several Houston junk dealers for $6000.
Under the working agreement between Womack and Mercer, Womack would first recoup his initial outlay of funds used to purchase the salvage, clean the warehouse in Houston, transfer the salvage to Shreveport, and rent warehouse space in Shreveport. After these expenses were satisfied the two men agreed to share equally in the proceeds from the venture. As Mercer withdrew the siding from the warehouse to be used on a particular job, Womack would bill him at the regular wholesale price for the siding. Mercer would then remit only half of the bill in payment since the two men were co-owners of the siding.
This arrangement lasted until October 31, 1967, when Womack sold his interest in the Houston salvage to Mercer for $3500. At that time approximately 1100 squares of siding remained from the original 1204 squares. Womack testified he sold his interest at this low price for a variety of reasons: (1) some of Womack's wholesale customers felt there was a conflict of interest since Womack was, in effect, in direct competition with them; (2) the siding that was purchased in Houston was colored siding and Womack testified he did not carry any colored siding in his stock because the demand for white aluminum siding was nine times greater than the demand for colored siding; (3) Womack had more than doubled his original investment in less than four months.
The second lot of goods, consisting of office furniture and equipment, was purchased by Mercer as salvage from a fire at M. L. Bath's warehouse in Shreveport on November 5, 1968. He paid $2500 for the entire contents of this warehouse and moved as much of the least damaged material as he could into his rented warehouse. The remainder of the goods was moved to another Bath warehouse or was left at the Bath warehouse which had burned. Mercer's rented warehouse now contained the aluminum siding salvaged from the Houston fire and the office furniture and equipment salvaged from the Bath fire. On January 1, 1969 the building and its contents were totally destroyed by fire. At that time approximately one-third of the warehouse was occupied by the siding and the remaining two-thirds by the furniture.
We now turn to the problem of determining the amount of goods that was actually in Mercer's rented warehouse at the time of the fire. Plaintiff did not keep an inventory of the material in his warehouse. The inventories he prepared in connection with this suit were all done from memory and from inspection of the remains after the fire. As to the Houston salvage, the only dispute is as to the number of squares of siding in the warehouse at the time of the fire, which Mercer calculated at 810 squares. He offered no proof of this other than his own estimate. An insurance adjuster figured there were approximately 585 squares of siding in the warehouse at the time of the fire. This figure was based on entries in a small notebook apparently belonging to Mercer, showing monthly withdrawals of siding from the warehouse from September of 1967 through May of 1968. The adjuster averaged the withdrawals over that nine-month *114 period and projected withdrawals at the average rate up until January 1, 1969, which resulted in a figure of 585 squares in the warehouse at the time of the fire. The trial judge apparently felt, as we do, that plaintiff failed to prove by a preponderance of evidence the warehouse contained 810 squares of siding; rather, the evidence supports a finding it contained approximately 585 squares at the time of the fire.
Mercer arrived at an inventory of office supplies and equipment by taking Bath's partial inventory of its warehouse and marking off those items that were still at the site of the Bath fire or were at the other Bath warehouse. The insurance adjuster followed much the same procedure and decided that the Mercer warehouse contained approximately 70% of the furniture and equipment plaintiff had purchased after the Bath fire.
The next question concerns the value to be placed on the goods that were destroyed by the fire. The insurance policy covered "warehouse contents, consisting principally of aluminum siding and office furniture. . . to the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, . . . ."
We are presented here with a novel question. How does one find the "actual cash value" of goods purchased as salvage after a fire? It is readily apparent there is no easily ascertainable market value or replacement value for such goods. Each lot of fire-damaged goods is unique since no two fires are the same; no two sets of goods damaged by fire are the same; and no two pieces of furniture in the same fire will be damaged to the same degree.
An annotation in 61 A.L.R.2d 711 considers the meaning of the "actual cash value" clause as it is used in insurance contracts. A summary of the annotation, appearing at page 713, states:
"Where property is of such nature that its market value can be readily determined, market value has frequently been applied as the test or criterion of actual cash value of property at the time of loss, under policies insuring to that extent. In a few cases, the courts although recognizing that the market value test would ordinarily be applicable, have refused to apply it where, under the existing circumstances, this test of actual cash value would fail to properly indemnify the insured. Another test or criterion, which has been employed in a great number of cases to ascertain the actual cash value of the insured's property at the time of loss, is the replacement or reproduction cost of the property lost.
"In recent years, a number of courts, seeking to effectuate more complete indemnity, have adopted a third method, the broad evidence rule, to determine actual cash value of property at the time of loss. Under this rule, the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of loss.
"Generally, it may be said that the proper test or criterion of actual cash value in a particular case depends upon the nature of the property insured, its condition, and other circumstances existing at the time of loss."
We are unable to cite any Louisiana cases directly on point. In Bogalusa Gin & Warehouse v. Western Assurance Co., 199 La. 715, 6 So.2d 740 (1942), the court determined the actual cash value of a building destroyed in a windstorm. The court stated:
". . . In arriving at the amount the plaintiff is entitled to recover, we must necessarily take into consideration all of the facts, viz., the price paid for the buildings, the estimate of their value made by the defendants' agent at the time the policies were issued, the policies *115 themselves, the terms of the policies and the cost of replacement . . . ."
In Hinson v. British America Assurance Co., 43 F.Supp. 951 (W.D.La.1942) the court was faced with the difficult problem of determining the value of bakery equipment destroyed by fire. In Hinson we note the following language:
". . . In addition to these troubles, some of the articles were practically new because the Hinsons themselves had bought them since their location at Leesville; but some of the articles, which they bought secondhand from Mansinger, are as old as fifteen years, with varying degrees of use. Then, again, some of the articles bought by the Hinsons since their coming to Leesville were bought secondhand but in excellent condition and at relatively low prices. The defendant, on these latter purchases, wishes to hold the recovery of the plaintiffs to the actual prices paid; we believe the sound value to be the fair gauge of worth."
In Reliance Insurance Company v. Board of Supervisors, La. St. U. & A&M C., 255 F.Supp. 915 (E.D.La.1966), the goods destroyed by fire were books and musical instruments. In arriving at the actual cash value of the goods, the court stated:
"The Standard Fire Policy in Louisiana, as described in LSA-R.S. 22:691, provides that the policy covers the property of the insured to the extent of the actual cash value of the property at the time of loss but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss. Thus, although replacement cost is not the sole criteria by which to measure the amount of loss, it is one factor that the Court may consider in arriving at actual cash value. Bogalusa Gin & Warehouse v. Western Assur. Co., 199 La. 715, 6 So.2d 740 (1942);Roberts v. Houston Fire & Cas. Co., 168 So.2d 457 (La.App. 3 Cir., 1964); Williams v. Gallagher Transfer & Storage Co., 170 La. 461, 128 So. 277 (1930); McGuire v. State Farm Fire & Cas. Co., 175 So.2d 838 (La.App. 3 Cir. 1965).
"Thus, taking into consideration the original cost, possible appreciation and depreciation, nature of the property involved, and current replacement cost, the Court determines, as a matter of law, that plaintiffs are liable to intervenor, Professor L. Bruce Jones, for the total sum of $26,644.55, . . . ."
The insurance company's approach to the valuation of both sets of goods is to multiply the percentage of such goods remaining in the warehouse by the price Mercer paid for each lot of goods purchased as salvage. We find this would not represent the "actual cash value" of the goods in this particular case. Purchasing goods as salvage after a fire is necessarily a speculative undertaking. The buyer hopes he will be able to salvage goods that are worth more than what he paid for them as salvage. In this case, the record clearly reflects both purchases by plaintiff were exceptional bargains. While the price Mercer paid for the goods as salvage is evidence which must be considered in fixing the "actual cash value" of the contents of the warehouse, it is by no means the only evidence the court should consider. The court must of necessity in a case such as this examine all the evidence relating to the value of the property at the time of the fire. The touchstone for the court in determining actual cash value is the basic principle that an adequately insured person should incur neither economic gain nor loss when his property is destroyed by fire. This principle applies subject to the terms of the particular contract of insurance which places a limit on the company's liability to not exceed "the amount which it would cost to repair or replace the property with material of like kind and quality." Of course, the burden is on plaintiff to prove the extent of his loss by a preponderance of the evidence.
*116 The valuation problem revolves around two groups of goods. One is the salvaged aluminum siding and the other is the office furniture. The other goods in the warehouse consisted of miscellaneous supplies and equipment used by plaintiff in his aluminum siding business. Plaintiff offered no proof other than his own estimate as to their quantity and value, which proof we find insufficient. We accept the adjuster's testimony as to their value, as follows:

Roof coating material $750.00
New Siding 1,500.00
Guttering, downspouts, windows
and screens 2,000.00
Corner posts and columns 500.00
Tools and equipment 250.00
 _________
 $5,000.00

We turn now to the valuation of the aluminum siding which we have previously found to be 585 squares or 48frac12; of the original 1204 squares purchased in Houston. The adjuster multiplied $3600 (the original purchase price of $2600 plus $1000 transportation expense) by 48frac12; and arrived at a figure of $1,746 as the actual cash value of the siding. Mercer argues the actual cash value should be the price it would cost to purchase the siding from a wholesaler such as Womack, minus 10% for fire damage. This computation results in a figure of $13,425.75. Womack testified he sold his one-half interest in the siding, or 550 squares, for $3500, representing a price of $6.36 per square. Multiplying $6.39 by 585 results in a figure of $3720.60, which we find to be a just amount. To award more would be indulging in sheer speculation.
We turn next to the value to be placed on the office furniture. An employee of Bath testified the furniture was damaged to such an extent it was more economical to purchase new merchandise than repair the damaged furniture. The insurance company adjuster estimated 70% of the furniture purchased from Bath was in Mercer's warehouse at the time of the fire. He multiplied $2500 (the price paid for the furniture) by 70% and arrived at a figure of $1750 as the actual cash value of the merchandise. Mercer argues he is entitled to $24,794.04, which was the cost to Bath of a portion of the furniture salvaged by Mercer.
A local auctioneer with 17 years experience in buying and auctioning merchandise of every description, testified the office furniture in Mercer's warehouse would bring between $25,000 and $40,000 at auction. He made an offer to buy the furniture from plaintiff for $12,500 and testified he might have gone as high as $15,000. From our review of the evidence, we feel that $12,500 represents the actual cash value of the office furniture.
To recapitulate, we find the actual cash value of the items in the warehouse at the time of the fire was:

Miscellaneous items $5,000.00
Aluminum Siding 3,720.60
Office furniture 12,500.00
 _________
 Total $21,220.60

After subtracting the $2,344.92 Mercer received by selling the remains of his goods after the fire as scrap, we find the actual cash value of the contents of the warehouse was $18,875.68. From this amount we subtract $100, the deductible portion under the insurance policy.
The judgment of the lower court is amended to increase the award to plaintiff from $7,052.47 to $18,775.68, and to cast St. Paul Fire and Marine Insurance Company with all costs. As thus amended, the judgment is affirmed.